UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
* * * * * * * * * * * * * * *   )
UNITED STATES OF AMERICA,       )    Criminal Action
                                )    No. 20-MJ-00100
             Plaintiff,         )
                                )
   vs.                          )
                                )
DOMINIQUE MALIK MAXEY,          )    Washington, DC
                                )    June 10, 2020
             Defendant.         )    11:38 a.m.
                                )
* * * * * * * * * * * * * * *   )
```

TRANSCRIPT OF PRELIMINARY HEARING VIA VIDEOCONFERENCE
BEFORE THE HONORABLE ROBIN M. MERIWEATHER,
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES:</u>

```
FOR THE GOVERNMENT:      NIHAR MOHANTY, ESQ.
                         UNITED STATES ATTORNEY'S OFFICE
                           FOR THE DISTRICT OF COLUMBIA
                         555 Fourth Street, NW
                         Eleventh Floor
                         Washington, DC 20530


FOR THE DEFENDANT:       TONY MILES, ESQ.
                         OFFICE OF THE FEDERAL PUBLIC
                           DEFENDER
                         625 Indiana Avenue, NW
                         Suite 550
                         Washington, DC 20004


FOR PRETRIAL SERVICES:   JOHN COPES
                         CHRISTINE SCHUCK
```

```
1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                               Official Court Reporter
2                              United States District Court for the
                                 District of Columbia
3                              333 Constitution Avenue, NW
                               Room 6706
4                              Washington, DC 20001
                               (202) 354-3269
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3                                    Direct      Cross        Red.

4

   WITNESSES FOR THE GOVERNMENT:
5
   Kevin Moore                        11          29           63
6

7

8  EXHIBITS RECEIVED IN EVIDENCE                              PAGE

9
   Government's Exhibit Nos. 1-8                              25
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  This Honorable Court is --

2    I'm hearing some feedback.  Everyone else, please mute your

3    phone or the video, what have you.  As soon as I finish,

4    then whoever is speaking can unmute.  Thank you.

5          This Honorable Court is now in session, Magistrate

6    Judge Robin M. Meriweather presiding.

7          Magistrate Case No. 2020-100-M, the United States

8    of America versus Dominique Malik Maxey.

9          Nihar Mohanty representing the Government; Tony

10   Miles representing the Defendant.  John Copes is the

11   pretrial services officer.  The Defendant is appearing by

12   video.

13         This case is set on the calendar this morning for

14   a preliminary hearing.

15         THE COURT:  Good morning again.  This case is set

16   for a preliminary hearing.

17         I understand that the Government did not have its

18   witness available by video and that the parties may be

19   asking to reschedule this to this afternoon.  Is that the

20   current status?

21         MR. MOHANTY:  Your Honor, this is Nihar Mohanty

22   for the United States.

23         That is the current status, your Honor.  I

24   apologize.  I didn't realize that my witness would not be

25   able to access the videoconference system.  But as an FBI

1    agent, he's not allowed to download outside apps, for lack

2    of a better word, on any equipment.  So he is going to try

3    to be -- to get a personal iPhone or a personal iPad or

4    laptop to be able to do that, and hopefully we can have the

5    hearing today at 3:00 if that's amenable to the Court.

6          THE COURT:  Just a question.

7          Ms. Kay, I don't know if Mr. Cramer is on the

8    line.  Would it be possible to set this hearing up to use

9    the other platform?  Is that compatible with more devices?

10   My understanding is that with this -- with the Cisco Jabber,

11   you have to be using Internet Explorer.

12         So I'm not sure if this agent -- I don't think

13   there's a way to use Cisco Jabber without downloading the

14   plug-in onto Explorer.  But I know the other system is

15   web-based and I know I have personally accessed that using

16   Safari from Apple devices.  So the agent might be able to

17   connect if we use the platform that we would normally use if

18   there were screen-sharing.

19         THE AUDIOVISUAL TECHNICIAN:  Hi, Judge.  This is

20   John.

21         We can certainly do the hearing using the CMS

22   program.  Then the users would all, everyone, would have to

23   connect using Google Chrome and then Kim would have to send

24   out all those instructions, which I don't know if you have

25   them.

1          Do you have those, Kim?  If not, I can send them.

2          THE COURTROOM DEPUTY:  I did, but somehow -- I

3     don't know how -- I saved them.  I have them here, but I

4     don't have them where I can send them out to everybody right

5     now.

6          THE AUDIOVISUAL TECHNICIAN:  I'll email them to

7     you within the next 20 minutes or so along with the codes

8     that will put us into Judge Meriweather's courtroom meeting

9     place.  We won't use her courtroom, obviously, but it's

10    always there for her.  But if somebody's using an iPhone or

11    an iPad again, they still might have to download something.

12    I'm not sure.

13         THE COURT:  I don't think so, Mr. Cramer.  I don't

14    think when I use that I download anything.  I always use my

15    iPad when I do meetings for that.  It's possible that I

16    downloaded something the first time, but I think it was

17    purely web-based with no downloads, at least using Safari.

18         THE AUDIOVISUAL TECHNICIAN:  I'll send those out

19    in a few minutes, then.

20         THE COURT:  Mr. Miles?

21         MR. MILES:  Yes, your Honor.  I just want the

22    record to reflect that Mr. Maxey is present.  He is present

23    by video.

24         And I was wondering if we should inquire of the

25    agent to see what equipment he expects to use so we can

1    determine which platform will be best for him.

2                THE COURT:  Right.  I agree, because I'd hate to

3    accommodate something and then it turns out we should have

4    kept it with this.

5                Mr. Mohanty, can you reach out to the agent to

6    find out what system he or she is most likely to be able to

7    use?

8                MR. MOHANTY:  Yes.  I can do that, your Honor.  If

9    the Court will indulge me, I believe Agent Moore is still on

10   the line.

11               Agent Moore, are you there?

12               AGENT MOORE:  Yes.  I'm still here.

13               MR. MOHANTY:  Go ahead, then, Kevin.  Do you know

14   what platform you'd be using?

15               AGENT MOORE:  Yeah.  I'm going to look to see if

16   we have a laptop here that is allowed to go through putting

17   an application on it.  If not, I do have a personal phone

18   that -- and I can utilize that.

19               MR. MOHANTY:  Thank you.

20               Your Honor, it sounds like maybe we should stick

21   with the platform that we are using or trying -- you guys

22   are using and I'm calling in.  That would probably be the

23   easiest thing.

24               THE COURT:  That works for the Court.

25               And maybe we should set a cutoff time by which the

1   agent can let us -- let you know and then you can let us

2   know if he's not able to access a laptop where he could

3   download the plug-in to be able to access this platform.

4   That way, if we know that that's not going to be an option,

5   then we can set up my video meeting room to use the other

6   platform and get the instructions out so that people can log

7   in.  But it would be more convenient if we all used the

8   instructions we already have, if the agent can connect with

9   Internet Explorer and downloading.

10           MR. MOHANTY:  Very well, your Honor.

11           This is Nihar Mohanty again.

12           Should we say 2:15?  Would that give you enough

13   time?

14           THE COURT:  Mr. Kay and Mr. Cramer, would 2:15 be

15   enough time to switch over to the other platform?

16           THE AUDIOVISUAL TECHNICIAN:  Yes.  As far as I'm

17   concerned, it should be, because you're looking at a 3:00

18   hearing.  Is that correct?

19           THE COURT:  Yes.

20           THE AUDIOVISUAL TECHNICIAN:  That should be plenty

21   of time.  I'm still going to send the instructions to Kim

22   Kay.

23           And then maybe, Kim, you should forward it to

24   everyone in case we have to switch it up.

25           THE COURTROOM DEPUTY:  I will do that, John.

```
 1              THE AUDIOVISUAL TECHNICIAN:  It shouldn't take

 2     long.  It's basically just shutting down one program and

 3     opening another one in a different browser window.

 4              THE COURT:  Okay.  That sounds good.  I'll

 5     continue this hearing until 3:00 p.m. so that the witness

 6     can be -- can participate by video.

 7              And by 2:15, the Government should let us know

 8     whether the agent is unable to download -- to use a laptop

 9     and download the software to connect by video using the

10     current platform so that we can try to switch this hearing

11     over to the other platform, which is, I believe, more

12     web-based on the user's end.

13              And then, Mr. Miles, I just want to confirm that

14     you and your client are available at 3:00 p.m.

15              MR. MILES:  Yes.

16              Mr. Maxey, are you available?

17              THE DEFENDANT:  (Inaudible.)

18              THE COURT:  We can't hear you, Mr. Maxey.  Are you

19     on mute?

20              THE DEFENDANT:  Yes, I am.

21              THE COURT:  That will conclude the hearing.  We'll

22     resume at 3:00 p.m.

23              Thank you.

24              MR. MILES:  Thank you, your Honor.

25              THE DEFENDANT:  Thank you.
```

1          (Thereupon, the Court went on to hear other

2     matters.  Proceedings reconvened at 3:21 p.m. as follows:)

3          THE COURTROOM DEPUTY:  Re-calling Magistrate Case

4     No. 2020-100-M, the United States of America versus

5     Dominique Malik Maxey.

6          Nihar Mohanty representing the Government; Tony

7     Miles representing the Defendant.  Christine Schuck is the

8     pretrial services officer.  The Defendant is appearing by

9     video.

10          This case is set today for a preliminary hearing.

11          THE COURT:  Thank you.

12          This case is set for a preliminary hearing.  The

13     purpose of this hearing is to determine whether there's

14     probable cause to support the charges that the United States

15     has brought against Mr. Maxey.

16          The United States has a witness who I see is

17     available by video.

18          Mr. Mohanty, you may begin with your presentation.

19          THE COURTROOM DEPUTY:  Before we start, your

20     Honor, I noticed that when you started speaking we have a

21     lot of background noise.  I'm not sure why, because I know

22     no one's in chambers with you.  But I just wanted to point

23     that out, that when you speak, we may get -- as long as the

24     court reporter can hear you when you're speaking, we'll be

25     fine.  It's just some background.  I don't know what it is.

```
 1    There's background noise when you speak.
 2              THE COURT:  What does it sound like?
 3              THE COURT REPORTER:  Hello, Judge.  It's the court
 4    reporter.
 5              It's just a whishing noise, Judge.  A mechanical
 6    whishing noise.
 7              THE AUDIOVISUAL TECHNICIAN:  It could very well be
 8    the fan on your laptop, which you may not hear sitting
 9    there, but it's probably right next to the microphone.  So I
10    guess as long as -- if you're on mute when everybody else is
11    speaking, we should be okay.
12              THE COURT:  Okay.  So I do think the air
13    conditioning is on in here.  I don't want to melt, but let
14    me see if I can turn that down.
15              THE AUDIOVISUAL TECHNICIAN:  Okay.
16              THE COURT:  So there is an air conditioner on, and
17    that may be what you hear; but there does not seem to be a
18    way for me to turn it off.  So I'll just stay on mute unless
19    I'm speaking, and hopefully that will work.
20              THE COURTROOM DEPUTY:  Actually, Judge, right now
21    we're not hearing the noise.  We'll just play it by ear.
22              Okay.  We're okay.
23              THE COURT:  You may proceed, Mr. Mohanty.
24              MR. MOHANTY:  Thank you, your Honor.
25              Your Honor, the Government would call Agent Kevin
```

```
1    Moore.  If he could be sworn, please.
2              KEVIN MOORE, GOVERNMENT WITNESS, SWORN.
3              THE COURTROOM DEPUTY:  Thank you.
4              MR. MOHANTY:  Thank you, your Honor.
5                        DIRECT EXAMINATION
6    BY MR. MOHANTY:
7    Q.  Agent Moore, could you begin by stating your first and
8    last name and spelling them both for the ladies and
9    gentlemen of -- for the Court.
10   A.  Yes.  Kevin Moore, K-E-V-I-N.  Moore is M-O-O-R-E.
11   Q.  And, Agent Moore, how are you employed?
12   A.  As a special agent with the Federal Bureau of
13   Investigation.
14   Q.  How long have you been with the FBI?
15   A.  A little over three years, almost four years.
16   Q.  And when you say the FBI, are you assigned to the
17   Washington Field Office?
18   A.  Yes.
19   Q.  Before you became an FBI agent, were you involved in law
20   enforcement?
21   A.  Yes.  I did a little over five years with the Norfolk
22   Police Department in Virginia.
23   Q.  Okay.  I want to turn your attention now to the
24   investigation of a break-in at the SunTrust Bank branch
25   located at 1275 K Street, Northwest, Washington, DC, that
```

1       occurred on May 31st, 2020, at approximately 2:00 a.m.

2               Are you familiar with that investigation?

3       A.  Yes.

4       Q.  Okay.  And can I ask you, first of all, is that an

5       FDIC-insured institution?

6       A.  Yes.

7       Q.  And what was your role in the investigation of that

8       incident?

9       A.  I worked alongside with MPD.  So when the individuals

10      were arrested, the case was provided to me for a federal

11      case.

12      Q.  Okay.  Just so the record is clear, you said you worked

13      alongside MPD.  When you say "MPD," do you mean the

14      Metropolitan Police Department here in DC?

15      A.  Yes.  Yes.

16      Q.  Okay.  Can I ask you, were you in a position during this

17      incident to personally observe what happened?

18      A.  Not in person.  It was after I saw pictures and

19      surveillance video.

20      Q.  Have you had the opportunity to speak with agents or

21      officers who were in a position to see what happened?

22      A.  Yes.

23      Q.  Okay.  And in connection with the complaint filed in

24      this case, did you prepare a statement of facts?

25      A.  Yes.

1    Q.  If the Court was willing to let you adopt that as part

2    of your testimony today in this hearing, would you be

3    willing to do that?

4    A.  Yes.

5          MR. MOHANTY:  Your Honor, we would ask that the

6    Court allow the Agent Moore to adopt his statement of facts

7    attached to the complaint to speed things up.

8          THE COURT:  Thank you.  I will allow that.

9          I just want to confirm, Mr. Miles, that you have a

10   copy of the complaint and the statement of facts.

11         MR. MILES:  Yes.

12         THE COURT:  Thank you.

13         MR. MOHANTY:  Thank you, your Honor.

14   BY MR. MOHANTY:

15   Q.  Agent Moore, I just want to clarify a few things that

16   were in the statement of facts that you signed off on back

17   on June 1st, I guess.

18         First of all, you mentioned that you weren't in a

19   position to personally observe the events as they happened.

20   Can I ask you, did you have a chance to speak to the agent

21   or officer who was in a position to see the events as they

22   happened?

23   A.  Yes.

24   Q.  Okay.  And approximately how far away from the bank was

25   that agent or officer when this happened?

```
 1    A.  That agent -- they were about 50 yards away from the
 2    bank.
 3    Q.  Okay.  And was that agent using anything that would
 4    enhance his vision, his ability to see?
 5    A.  Yes.  He was -- that agent was utilizing binoculars.
 6    Q.  Okay.  Did the agent tell you what the lighting
 7    conditions were like?
 8    A.  Yes.  They had said that there are streetlights.
 9    Nothing was deterring what they could visually see through
10    the binoculars.
11    Q.  Okay.  I think I misheard you through the connection
12    here.
13         I think what -- did I hear you correctly that
14    there were streetlights or other lights on that allowed him
15    to see?
16    A.  Correct.
17    Q.  Okay.
18         MR. MILES:  Your Honor, I would ask that -- he
19    answered.  But in the future, rather than suggest what the
20    officer said, I would ask him just to repeat his question so
21    he's not leading the witness.
22         MR. MOHANTY:  Very well.
23         THE COURT:  Thank you.
24         MR. MOHANTY:  Very well.  I'll keep that in mind,
25    your Honor.
```

1          THE COURT:  Okay.  Thanks, Mr. Mohanty.

2    BY MR. MOHANTY:

3    Q.  Agent Moore, if we could continue.

4          Could you briefly describe what first drew that

5    agent's attention to the bank or the area immediately

6    outside the bank?

7    A.  Yes.  The agent had observed a group of -- they

8    specified six to ten individuals walking down the sidewalk.

9    They stopped in front of the SunTrust Bank and proceeded to

10   break into the ATM and destroy the ATM at SunTrust Bank.

11          That is when the agent officer observed that same

12   group pick up objects and attempt to break the front window

13   and in which they ultimately did break the front window, and

14   that's when they observed the individuals running inside the

15   bank.  There were only in for a short period before they ran

16   out and then they ran back into the bank.  And then they

17   were in there for an amount of time and they came back out

18   of the bank.

19   Q.  Okay.  Can I stop you?

20   A.  So --

21   Q.  I'm sorry.  Go ahead.

22   A.  No, no.  Go ahead.

23   Q.  I want to clarify a few things first.

24          So, first of all, you said that the agent observed

25   a group of between six and ten people, I think you said,

1    doing something to an ATM machine.  Is that right?

2    A.  Yes.

3    Q.  And just to be clear, was the ATM machine outside the

4    bank or inside the glass doors?  Does that make sense?

5    A.  Yes.  It was outside the bank.

6    Q.  And what were these six to ten people doing or trying to

7    do to the ATM machine?

8    A.  It appeared to the agent that they were trying to break

9    into the machine in an attempt to -- and through that

10   attempt, they destroyed the machine.

11   Q.  And then you said that the agent you spoke to said that

12   he saw several people -- or some persons trying to break the

13   window or glass of the bank building itself.  Is that right?

14   A.  Yes.

15   Q.  Okay.  And did those same six to ten individuals -- were

16   they the same individuals that then went into the bank?

17   A.  Yes.

18   Q.  Okay.  And then at what point -- what did the agent that

19   was observing all this -- what did he or she do at that

20   point when you saw them attempting to break into the --

21   break the ATM and then going into the bank after they had

22   broken a window?

23   A.  Yes.  That agent told me that they put over the radio

24   that they were -- they put out a lookout for the individuals

25   that were in the -- breaking into the bank.

1    Q.  And then I take it other officers came to assist?

2    A.  That is correct.

3    Q.  And you said that the agent put out a lookout.  You mean

4    that -- a voice over the radio with descriptions of what was

5    going on.  Is that correct?

6    A.  That is correct.

7    Q.  And when you said that he gave a lookout, do you know of

8    the six to ten individuals who he was in fact describing?

9    A.  No.  I do not have that information.

10   Q.  Okay.  And then at some point, did other officers come

11   to the scene?

12   A.  Yes.

13   Q.  And when was it that the Defendant in this case,

14   Mr. Maxey, was stopped?

15   A.  It was after they had come out of the bank.  They had

16   gotten to the corner of K Street and 13th when police

17   stopped Mr. Maxey and a female.

18   Q.  You said police stopped Mr. Maxey and a female near 13th

19   and K.  So about how far away is that from the front

20   entrance -- or the entrance that was broken into by these

21   individuals?

22   A.  It appears to be more than 20 yards away.

23   Q.  Okay.  And after they were stopped, the agent that had

24   observed the six to ten individuals attempting to destroy

25   the ATM and then breaking the glass and going into the bank,

1  was that individual able to confirm whether or not the

2  person they had thought Mr. Maxey was, in fact, one of the

3  people that had attempted to destroy the ATM and then go on

4  into the bank?

5  A.  Yes.  The agent identified Mr. Maxey as one of the

6  individuals that was involved with the breaking of the ATM

7  and breaking into the bank.

8  Q.  When the agent made that confirmation, do you know how

9  far away he or she was from where Mr. Maxey was?

10  A.  I believe they said they were across the street from

11  where the officers [indiscernible] Mr. Maxey.

12  Q.  I'm sorry.  I didn't hear you there.  You said where the

13  officers "something" Mr. Maxey.  Can you repeat your answer

14  for me, please?

15  A.  Yes.  Where the officers were with Mr. Maxey.

16  Q.  And then in the course of your investigation, how was it

17  that Mr. Maxey was identified?  By name, date of birth,

18  other identifiers?

19  A.  Yes.  Name, date of birth.  It was his FBI number and

20  address, and also on his property he had an ID with his name

21  on it with a birth certificate.

22  Q.  I'm sorry.  You said with a -- what?

23  A.  With a birth certificate as well.

24  Q.  Okay.  And are you able to --

25          THE COURT:  Just a moment, Mr. Mohanty.  It looks

```
1    like we lost Mr. Maxey.

2            MR. MILES:  Yeah.  That's what I'm concerned about

3    as well.

4            Let's just pause, if you don't mind.  He may reach

5    me and I'll try to reach him.

6            THE COURT:  Thank you, Mr. Miles.

7            Also, I'm still here.  I'm just turning my camera

8    off for a minute.  So I'll turn the camera back on when

9    Mr. Maxey comes back.

10            (Pause in the proceedings.)

11            THE DEFENDANT:  Sorry about that.  I lost the

12    Internet connection.

13            THE COURTROOM DEPUTY:  Thank you, Mr. Maxey.

14    We've paused, Mr. Maxey, while you were off.  So we will

15    resume soon.

16            Mr. Maxey, mute your phone, please.

17            THE DEFENDANT:  Okay.

18            THE COURTROOM DEPUTY:  Thank you.

19            MR. MOHANTY:  Your Honor, this is Mr. Mohanty.

20    May I proceed?  I'm not sure where Mr. Maxey got left off.

21            THE COURT:  Yes.  I interrupted you as soon as I

22    saw him drop off.  So you can resume and ask questions.

23            MR. MOHANTY:  Okay.

24    BY MR. MOHANTY:

25    Q.  Mr. Moore, I believe my last question to you was as to
```

1    how it was that the FBI and you in particular identified

2    Mr. Maxey that evening.  And you were mentioning that after

3    the officer that saw him -- or agent that saw him from

4    across the street, when he was stopped by other officers,

5    you indicated that recovered from Mr. Maxey was

6    identification cards and a birth certificate.  Is that

7    correct?

8    A.  That is correct.

9    Q.  Okay.  And when you were comparing Mr. Maxey's known

10   date of birth with the date of birth of the person who was

11   arrested that night, did they match up?

12   A.  It was Dominique Maxey.

13   Q.  And you said the FBI number was the same?

14   A.  That is correct.

15   Q.  Okay.  I don't know if you can see Mr. Maxey well there,

16   Agent Moore.  But are you able to compare him as he appears

17   on the video as to the arrest photo that was taken of him

18   that night?

19   A.  The video at this point is a little dark.  So the lights

20   behind are kind of making his appearance like a shadow in a

21   way.  I can't see his face.

22           THE COURTROOM DEPUTY:  Mr. Maxey, are you able to

23   get up and move a little to your -- well, move away from

24   where the lights are.  The lights need to be in the back.

25   Can you stand up and move a little away from those lights

```
 1    for just a moment?

 2              THE DEFENDANT:  (Complies.)

 3              THE COURTROOM DEPUTY:  That didn't really work

 4    that well.

 5              Stand up and move a little backwards.

 6              THE DEFENDANT:  (Complies.)

 7              THE COURTROOM DEPUTY:  Just stand there for a

 8    moment.

 9              No.  That's not really working.

10              I tried my best.

11              MR. MOHANTY:  Thank you, Ms. Kay.

12    BY MR. MOHANTY:

13    Q.  Well, allow me to clarify the questions, Agent Moore.  I

14    think this is clear to all of us, but we need to make a

15    complete record.

16              When you say that his FBI number matched, can you

17    explain what an FBI number is?  Is that a unique number?

18    A.  Yes.  It's a unique number given to the individual based

19    on the FBI's -- if he's committed any crimes or anything.

20    They also have a number associated to them through the DC --

21    City of DC as well.  There's a unique number.

22    Q.  What about a Social Security number?

23    A.  Yes.  The Social Security number that's listed for

24    Dominique Maxey also comes back to him as well.

25    Q.  Okay.  When you say "comes back to him," you mean the
```

1    person that was stopped and arrested that night?

2    A.  Correct.

3    Q.  Okay.  And I believe you said that recovered from

4    Mr. Maxey that night were identification cards in his name,

5    I take it?

6    A.  Yes.

7    Q.  Okay.  And you also said he had a birth certificate with

8    him.  Is that right?

9    A.  That is listed in his property.  Yes.

10    Q.  Okay.  Agent Moore, have you had the opportunity to

11    review still photographs that were taken that night in

12    particular during the exhibit -- well, what have been marked

13    for identification as Government's Exhibit 1 and 2?

14    A.  Yes.

15    Q.  Okay.  Are these fair and accurate depictions of the

16    SunTrust ATM located at 1275 K Street Northwest, Washington,

17    DC, after the incident that night?

18    A.  Yes.

19          MR. MOHANTY:  Your Honor, the Government would

20    move admission of Government's Exhibits 1 and 2.

21          MR. MILES:  Without objection.

22          THE COURT:  Thank you.

23          Mr. Mohanty, just since we're not doing screen

24    sharing, can you state what Exhibits 1 and 2 are?

25          MR. MOHANTY:  Sure.  Your Honor, Government's

1    Exhibit No. 1 is a picture of an ATM that has been -- above

2    it is the name SunTrust, and it looks like it's been for

3    lack of a better word destroyed.  It looks like the front

4    has been ripped off of it so it cannot be used.

5          And Government's Exhibit No. 2 is a photograph of

6    the SunTrust Bank branch depicting the front door and then

7    next to it a glass window that has been shattered almost

8    completely.

9          THE LAW CLERK:  This is Amanda.

10          Mr. Mohanty emailed the exhibits to me, so I have

11    them.  They're all in one .pdf.  If you'd like, if you have

12    a moment, if it would be helpful I can bring them into

13    individual exhibits and email them to you.  I just need a

14    moment to separate them unless you want me to send all of

15    them.

16          THE COURT:  Just send them all.  Thank you.  You

17    can send them together.  You don't have to separate them.

18          THE LAW CLERK:  I'm sending them right now.

19    BY MR. MOHANTY:

20    Q.  I'd like to ask you, during the course of the

21    investigation, Agent, were you able to recover or were other

22    officers able to recover any surveillance video from inside

23    the SunTrust Bank?

24    A.  Yes.  They were able to recover the inside video of the

25    SunTrust Bank.

1    Q.  Okay.  Did you have a chance to take a look at what was

2    marked for identification as Government's Exhibits 3 through

3    8?

4    A.  Yes.

5    Q.  Okay.  And can I ask you, what are Government's Exhibits

6    3 through 8, which hopefully Judge Meriweather has?

7    A.  Through those photos, they're stills of surveillance

8    video from inside the bank showing the window -- the front

9    window being broken and then a group entering the SunTrust

10   Bank.  I believe towards the end of the photo stills are of

11   an individual wearing a black coat with tan cargo pants,

12   black boots and a knit cap, rummaging through drawers and

13   the countertops behind the teller line before leaving the

14   bank.

15   Q.  And just so we're clear, are those fair and accurate

16   still photos from the surveillance tape that you viewed?

17   A.  Yes.

18             MR. MOHANTY:  Your Honor, the Government would

19   move for admission of Government's Exhibits 3 through 8.

20             THE COURT:  Give me just one minute.  It's

21   downloading.  Let me just pull them up.

22             Any objection from the defense?

23             MR. MILES:  Sorry, your Honor.  I had to get back

24   to unmute my mic.

25             Let me go back and just finish -- I've seen these

1    already.  I just want to look at these exhibits, if I could
2    have a moment.
3                THE COURT:  Sure.
4                MR. MILES:  No objection, your Honor.
5                THE COURT:  Thank you.
6                Those exhibits are admitted.
7                (Whereupon, Government's Exhibit Nos. 1 through 8
8    were entered into evidence.)
9                THE COURT:  And if I didn't state the other two
10   exhibits were admitted, those are admitted as well.
11               Thank you.
12               MR. MOHANTY:  Thank you, your Honor.
13   BY MR. MOHANTY:
14   Q.  Agent Moore, the first exhibit of those stills, Exhibit
15   3, appears to show somebody in the right-hand side coming
16   through the glass window.
17               Do you see that?
18   A.  Yes.
19   Q.  And can I ask you, who is that person?
20   A.  Based on the clothing description, it appears to be
21   Mr. Dominique Maxey.
22               MR. MILES:  Excuse me.  Which exhibit?
23               MR. MOHANTY:  Government's Exhibit No. 3.
24               MR. MILES:  Okay.
25

```
 1    BY MR. MOHANTY:
 2    Q.  And then Exhibit No. 4 appears to be that same
 3    individual fully into the bank running towards the --
 4              MR. MILES:  Objection, your Honor.  I object to
 5    the Government referring to the person as being the same as
 6    who's in Government's Exhibit 3.  That should be the
 7    witness.
 8              MR. MOHANTY:  Very well, your Honor.
 9              THE COURT:  Could you rephrase it?
10              MR. MOHANTY:  Very well, your Honor.
11    BY MR. MOHANTY:
12    Q.  Agent Moore, can you tell us what we're seeing in
13    Government's Exhibit 4?
14    A.  Yes.  So the individual that was through the window in
15    Exhibit No. 3, that individual came completely into the bank
16    and is now running into the bank.
17    Q.  Is that the same individual you described earlier as
18    Defendant Dominique Maxey?
19    A.  Yes.
20    Q.  And can you tell us what we're seeing in Government's
21    Exhibit No. 5?
22    A.  In this exhibit, the rest of the group is coming into
23    the bank after the first individual.
24    Q.  Okay.  And Government's Exhibit No. 6?
25    A.  Again, more individuals coming into the bank.
```

1    Q.  Government's Exhibit No. 7:  Can you tell us what that

2    is?

3    A.  Yes.  The same individual that came into the bank first

4    with the tan cargo pants, black jacket, knit cap and black

5    boots behind the teller line in this photo is still

6    rummaging through the drawers and the countertops behind the

7    teller line.

8    Q.  Can I ask you, you mentioned his clothing depicted in

9    what is actually a color photo at Government's Exhibit 7,

10   black boots, black jacket, black boots -- I'm sorry -- tan

11   cargo pants, I think.  Right?

12   A.  Yes.

13   Q.  Can I ask you, that clothing, the pants, the boots, the

14   jacket, was that recovered from Mr. Maxey after his arrest?

15   A.  Yes.

16   Q.  And it appears that he has a T-shirt or sweatshirt with

17   what -- it appears to be black in my photo with an insignia

18   of some kind right in the middle.

19        Do you see that?

20   A.  Yes.

21   Q.  Can I ask you, was that recovered from Mr. Maxey the

22   night of his arrest as well?

23   A.  That was not recovered from Mr. Maxey.  That was

24   recovered from another individual.

25        According to the police report, after Mr. Maxey

1    and the female he was with were stopped, they got to the

2    First District cell block.  They were served.  And this is

3    when Mr. Maxey passed along that shirt or sweater to the

4    female that he was with.

5    Q.  And Government's Exhibit 8:  What is that?  Agent Moore,

6    just so the record is clear, could you -- you were

7    explaining that -- referring to the -- well, the sweater,

8    T-shirt, sweatshirt, the item of clothing that Mr. Maxey

9    appears to be wearing in Government's Exhibit 7, Exhibit 7,

10    that has the kind of distinct logo under his black jacket.

11    You were describing how that was recovered later at the

12    police station, I believe?

13    A.  Yes.

14    Q.  Okay.  Can you just repeat how that was recovered?

15    A.  After Mr. Maxey and the female he was with were

16    arrested, they were transported to the First District cell

17    block holding area.  After they were searched, according to

18    the arrest report, Mr. Maxey passed along that sweater to

19    the female that he was with because she was cold.

20    Q.  Okay.  And then Government's Exhibit No. 8:  Could you

21    tell us what that's showing?  There --

22    A.  Yeah.  Again, the same individual with the black boots,

23    tan cargo pants, black jacket and a knit cap still behind

24    the teller line at the SunTrust Bank going through the

25    drawers and the counters.

1    Q.  And the person you're referring to with the cargo pants

2    and other clothing, is that the person who appears to be

3    closest to us in the photo?  There are two other people

4    behind him, it looks like.

5    A.  Yes.  Sorry about that.  And there's, yeah, two other

6    individuals behind the teller line appearing to be doing the

7    same thing, going through drawers and looking around on the

8    countertops.

9    Q.  Okay.  And again, just so the record is clear, the

10   person depicted in Government's Exhibit 8 in the tan cargo

11   pants and the person depicted in Government's Exhibit 7 in

12   the tan cargo pants, is that the Defendant in this case,

13   Dominique Maxey?

14   A.  Yes.

15   Q.  Okay.

16          MR. MOHANTY:  Thank you.  No further questions at

17   this time, your Honor.

18          THE COURT:  Thank you.

19          Mr. Miles?

20          MR. MILES:  Yes.

21                     CROSS-EXAMINATION

22   BY MR. MILES:

23   Q.  Good afternoon, Officer.

24   A.  Good afternoon.

25   Q.  So we learned under direct that the statement of facts

1   attached to the complaint was written by you.  Is that

2   correct?

3   A.  Yes.  That is correct.

4   Q.  Did you prepare any other police reports in connection

5   with the matters about which you testified today?

6   A.  No.

7   Q.  Did you take any notes about these matters?

8   A.  No.

9   Q.  Did you send any text messages?

10  A.  No.

11  Q.  Did you draw any diagrams?

12  A.  No.

13  Q.  And have you made any statement, I guess, written or

14  oral that's been recorded in any way?  For example, have you

15  testified, you know, before a grand jury or have you

16  recorded any statement in any other way with regard to the

17  matters about which you testified?

18  A.  No.

19  Q.  So as I understand your testimony, you were not

20  physically present in the area of the SunTrust Bank on

21  K Street Northwest, Washington, DC, on May 31st, 2020, at

22  around 2:03 a.m.  You were not present in the vicinity.  Is

23  that correct?

24  A.  That is correct.

25  Q.  Did you arrive on the scene later that morning after the

1    events had already transpired?

2    A.  No.

3    Q.  When did you first become aware of this incident that

4    you've testified about today?

5    A.  The next day, which is on June 1st, 2020.

6    Q.  Okay.  At about what time?

7    A.  It was fairly early in the morning, because that's when

8    I started drafting the statement back.

9    Q.  Now, let's -- just so we have clarity, the incident

10   happened early in the morning of May 31st at 2:03, I

11   understand.  Are you referring to later that morning or do

12   you actually mean the next day?

13   A.  On June 1st.  That's when I -- yeah.  It would have had

14   to have been June 1st when the case was provided.

15   Q.  I just wanted to be clear.  Sometimes it can be

16   confusing.

17   A.  Yes.  Absolutely.

18   Q.  Now, so you spoke -- I understand that you spoke with

19   officers that were on the scene that morning, on May 31st?

20   A.  That is correct.

21   Q.  How many officers did you speak with who were on the

22   scene?

23   A.  Just two.

24   Q.  And of those two, how many actually observed these

25   individuals breaking the windows and going in the bank, you

1    know, those activities that you described?

2    A.  Just the one.

3    Q.  So you only spoke with one officer who claims they saw

4    these people stop in front of the bank, go into the bank,

5    and observed them inside the bank.  Am I understanding that

6    correct?

7    A.  Yes.

8    Q.  And this one officer was -- did you say 50 yards away,

9    about?

10   A.  Yes.  That's what they stated.  Yes.

11   Q.  Okay.  Were they -- where specifically was the officer

12   located?

13            MR. MOHANTY:  Objection.  Objection.

14            THE COURT:  Could you --

15            MR. MILES:  What's the basis?  I'm asking where

16   the officer was located who made these observations so we

17   can understand more information about that person's vantage

18   point and ability to observe these events.

19            MR. MOHANTY:  We have no objection to him asking

20   in general.  But he's not entitled to know specifically

21   where he was in case that observation area is used again in

22   an observation post setting.  He can ask and he's ready to

23   explain he was 50 yards away and nothing was obstructing his

24   view.

25            MR. MILES:  Well, your Honor, this is

 1    cross-examination.  I'm allowed to get further details.  I

 2    might determine that there's something about that location

 3    that may interfere with the officer's ability to adequately

 4    see the events.

 5              So it's relevant.  And I'm not sure why the Court

 6    should sustain the Government's objection.

 7              THE COURT:  The objection is mostly overruled.

 8    However, you may answer the question; but if there's some

 9    level of detail that would compromise ongoing law

10    enforcement operations, I will allow you not to provide

11    that, provided that you indicate that that's what you're

12    doing.

13              THE WITNESS:  Yeah.  The agent had stated that

14    they were 50 yards away and at a corner.  They didn't

15    specify which corner.  They were 50 yards away at a corner.

16    BY MR. MILES:

17    Q.  Was the agent inside of a building?

18              MR. MOHANTY:  I see the court reporter has her

19    hand up.

20              THE COURT REPORTER:  Sorry.  I'm getting the

21    roaring noise again.

22              THE AUDIOVISUAL TECHNICIAN:  Could everyone except

23    for Mr. Miles and the witness mute their microphones,

24    please?

25              MR. MILES:  I have the air conditioning on.  I'm

```
1    concerned.  I wonder if that's it.  Should I go try to turn

2    it off?

3              THE AUDIOVISUAL TECHNICIAN:  Is it close to your

4    microphone?

5              MR. MILES:  It really isn't.

6              THE AUDIOVISUAL TECHNICIAN:  I doubt that's it.  I

7    have a feeling it's somebody's machine that is putting the

8    noise out, just something inherent in the video call, or

9    it's a machine that's actually blowing a fan.

10             THE COURT:  Go ahead.

11             THE WITNESS:  I believe the question you were

12   asking was if he was located somewhere, like inside a

13   building?

14             MR. MILES:  Correct.

15             THE WITNESS:  No.  He stated that -- the agent

16   stated that they were in their vehicle sitting on a corner.

17   BY MR. MILES:

18   Q.  Okay.  Do you know whether the vehicle had tinted

19   windows?

20   A.  I do not.

21   Q.  Do you know whether the windows were up or down?

22   A.  I do not.

23   Q.  And you said it was nighttime.  It was dark outside.

24   Correct?

25   A.  Correct.  It was 2:00 in the morning.
```

Moore - CROSS - By Mr. Miles

1    Q.  And you made a general statement on direct that it

2    was -- that there were lights outside.

3               Did the agent specify where those lights were in

4    relation to the SunTrust Bank?

5    A.  He did not specify.  No.

6    Q.  Did the agent indicate how many lights were on in the

7    area?

8    A.  No.

9    Q.  Did the agent indicate whether he or she was alone in

10   the vehicle?

11   A.  No.  No, they didn't.

12   Q.  Did the agent indicate whether anyone else made similar

13   observations?

14              MR. MOHANTY:  Objection.

15              MR. MILES:  Your Honor, that is relevant because

16   I'm trying to determine, you know, how many people we're

17   relying on.  If we're only relying on the testimony of one

18   individual and we have information about that person's

19   vantage point and ability to see, I think that says a lot

20   about probable cause in this case.

21              MR. MOHANTY:  I think it's just discovery, your

22   Honor.

23              THE COURT:  I think that's close enough.  I'll

24   rein it in if we get too far.  But I think that's okay.

25              It's overruled.

```
1              MR. MOHANTY:  Thank you, your Honor.

2    BY MR. MILES:

3    Q.  You may answer, Agent.

4    A.  Can you say the question again?

5    Q.  Do you know -- did the agent inform you whether he or

6    she looked to anyone else who stated they made similar

7    observations about individuals going to the bank and

8    breaking the windows of the SunTrust Bank?

9    A.  No.  They didn't mention anybody.

10   Q.  Okay.  Did that agent take any photographs of what he or

11   she saw?

12   A.  None were provided to me from that agent, if they did or

13   didn't.

14   Q.  Okay.  And what about any video from that agent?

15   A.  No.  Again, none were provided to me, if they did or

16   they didn't.

17   Q.  Okay.  Now, the other agent that you spoke with, was

18   this somebody who was a part of Mr. Maxey's arrest?

19   A.  Yes.

20   Q.  And so is it fair to say that this second officer did

21   not see any of the events that support the allegation that

22   Mr. Maxey committed a crime inside of the SunTrust Bank?  Is

23   that correct?

24   A.  From talking with that officer, they had seen the group

25   of individuals at the bank.  But that's as far as it goes.
```

1    They [indiscernible] to speak with the agent which gave a

2    more description -- you know, more of a description of what

3    had happened.

4    Q.  When you say "at the bank," do you mean inside the bank

5    or outside the bank with regard to this officer?

6    A.  This officer?  I don't recall when speaking with them if

7    they had seen the individuals in the bank or if it was

8    strictly outside the bank.

9    Q.  Now, you indicated that you observed --

10              THE DEFENDANT:  I lost the video.

11              MR. MILES:  Can you hear, Mr. Maxey?

12              THE DEFENDANT:  I can hear, but I lost the video.

13              MR. MILES:  Can you hear me, Mr. Maxey?

14              THE DEFENDANT:  I can hear you, but I lost the

15    video.

16              MR. MILES:  Are you okay with me continuing with

17    you not being able to see the witness but I can see the

18    witness?

19              THE DEFENDANT:  Yes.  That's fine.

20              MR. MILES:  Thank you.  Please mute your

21    microphone.

22              THE COURT:  Is anyone else getting an echo?

23              MR. MILES:  Yes, your Honor.  That's Mr. Maxey.

24    He's in a location where we get a severe echo when his mic

25    is on.

```
 1                 THE COURT:  Thank you.
 2                 MR. MILES:  I assume you don't hear it any longer.
 3    Is that correct, your Honor?
 4                 THE COURT:  That's correct.
 5                 MR. MILES:  May I proceed?
 6                 THE COURT:  Yes.  Did the court reporter -- did
 7    you need anything repeated?
 8                 THE COURT REPORTER:  I've got it.  Thank you,
 9    Judge.
10                 THE COURT:  Thank you.
11    BY MR. MILES:
12    Q.  So, Officer, I was going to ask you, as I understand it,
13    you observed some surveillance video in connection with this
14    case --
15    A.  Yes.
16    Q.  -- from inside the SunTrust Bank, the one at 1275 K
17    Street Northwest, Washington, DC?
18    A.  Yes.
19    Q.  Did you observe any video from any other source?
20    A.  No.  That was the only video.
21    Q.  Are you aware of whether any efforts were made to gain
22    video from any other source, for example --
23                 MR. MOHANTY:  Objection.  Objection.
24                 THE COURT:  Mr. Miles, what's the connection for
25    probable cause?
```

```
1              MR. MILES:  Well, your Honor, it goes to bias

2     whether they are just arresting somebody and have determined

3     and are convinced that's the person who they think committed

4     the offense without doing a thorough investigation into the

5     objective facts to get more information about what's going

6     on.  So I think that the kind of quality of the

7     investigation is relevant to the Court's determination of

8     probable cause.

9              THE COURT:  I'll overrule it.

10             But, Mr. Miles, let's not veer too far into

11    discovery [indiscernible].

12             The witness can answer the question, please.

13             THE WITNESS:  I have not been able to obtain any

14    further video.  I don't know if Metropolitan Police

15    Department has obtained further video yet.

16             MR. MILES:  May I go on?

17             THE COURT:  Yes.  Basically, I should just note

18    I'm on mute unless I'm speaking.  I'm on mute.

19    BY MR. MILES:

20    Q.  So, Officer, if I understood your testimony on direct,

21    you observed and you just said a moment ago it was video

22    from inside the bank.  Did you observe any video from that

23    same bank that shows the outside of the bank?

24    A.  No, I did not.

25    Q.  And from viewing this video, you believe that some --
```

1    that you were able to see Mr. Maxey depicted in the video.

2    Correct?

3    A.  That is correct, based on his clothing description and

4    him shortly being stopped after leaving the bank in the same

5    clothing.

6    Q.  So it's based on the clothing description you're seeing

7    in the video; and you're comparing that with what?

8    A.  When he was stopped by police shortly after leaving the

9    bank.

10   Q.  And what specific clothing do you believe matched what

11   you saw in the video and what the person that was stopped by

12   the police later was wearing?

13   A.  Yes.  The black jacket, the black-and-white

14   shirt/sweater that was underneath the black jacket, and tan

15   cargo pants and black boots.

16   Q.  Now, to be clear, you already made clear that you did

17   not see -- you did not personally observe the clothing of

18   the person inside -- or any of the people inside the bank.

19        Did you observe the clothing on the person that

20   was arrested or are you relying on what other officers told

21   you about how that person was clothed?

22   A.  I'm confused about the beginning of that question.  I

23   have video stills of the individual wearing that clothing,

24   and that's what I provided as the clothing description of

25   the individual that was stopped.

```
 1    Q.  On the first part, I'm just simply saying you're relying

 2    on the video with regard to the clothing [indiscernible]

 3    bank.  You were not there.  Is that correct?

 4    A.  That is correct.

 5    Q.  And with regard to the person that was arrested and how

 6    that person was clothed, did you have an opportunity to see

 7    the clothing on that person for yourself or did you learn

 8    how they were clothed from other people such as law

 9    enforcement officers?

10    A.  I learned about how he was clothed from -- our FBI

11    evidence response team had taken the clothes as evidence

12    upon his arriving at the cell block.

13    Q.  Now, if I understand your testimony, the identification

14    is made based on clothing.  Is that correct?

15    A.  Yes.

16    Q.  It's not based on facial features.  Is that correct?

17    A.  That is correct.

18    Q.  For example, it's not based on eye color.  Right?

19    A.  Right.

20    Q.  It's not based on the shape of anybody's nose.  Correct?

21    A.  Correct.

22    Q.  Or the shape of their [indiscernible]?

23    A.  Correct.

24    Q.  What about race?  Can you identify the race of the

25    individual in the video?
```

1    A.  The one that we're speaking of currently, the one

2    wearing the tan pants, black boots, black jacket, black

3    shirt with the insignia on it, that individual appears to be

4    a black male.

5    Q.  Was the individual -- this is a pretty relevant question

6    these days:  Was the individual depicted -- that we're

7    speaking about today wearing a mask?

8    A.  Yes; that was partially covering his face.

9    Q.  What portion of his face was covered?

10   A.  I believe from either underneath the nose and down or at

11   the nose and down.  So you could still see his eyes and the

12   upper part of his face.

13   Q.  Were you able to -- let me ask, how well were you able

14   to observe the person's physical build in the video that

15   we're speaking of --

16   A.  The individual --

17   Q.  -- the individual [indiscernible] Mr. Maxey?

18   A.  That's, you know, tough, because surveillance videos

19   could distort depending on the type of camera that's used.

20   But based on that surveillance video, the individual appears

21   to be semi-stocky, not skinny, not fat, somewhere in

22   between.

23   Q.  What about height?

24   A.  Height, I couldn't tell you.

25   Q.  What about weight?

1    A.  Like I said, I can only give you the type of build.  I

2    couldn't specify [indiscernible].

3    Q.  Okay.  Now, this person that you say is Mr. Maxey that

4    you see in the bank surveillance video, is this the

5    person -- you said he was the first one -- well, let me back

6    up.  Sorry.  Let me rephrase that.

7            You testified that there were a group of maybe six

8    to ten people that first were seen walking near the bank and

9    then they stopped in front of the bank.  Correct?

10   A.  Yes.  That is correct.  The agent had told me that's

11   what had happened.

12   Q.  And is it your testimony that Mr. Maxey was amongst that

13   group of six to ten individuals?

14   A.  That's what the agent had told me.  Yes.

15   Q.  So tell me about that.  The agent said that he or she

16   saw Mr. Maxey in that group?  What did the agent say about

17   that?

18   A.  The agent had explained that this group came up to the

19   SunTrust Bank, stopped in front of it.  At that point, that

20   same group had destroyed the ATM machine in front of the

21   bank and were the ones that broke the front glass to the

22   bank and proceeded to go inside.

23   Q.  But the question really is that this agent, I

24   understand, told you Mr. Maxey was part of that group.  How

25   did this agent know Mr. Maxey was part of the group?  Did

1    the agent identify him by name or description?

2    A.  No.  The agent never identified Mr. Maxey by name.  The

3    agent only identified Mr. Maxey when Mr. Maxey and a female

4    he was with were stopped by the police.  That's when the

5    agent came and identified Mr. Maxey, but not by name; only

6    as an individual that participated in the breaking of the

7    ATM and break-in of the bank.

8    Q.  And this agent specifically told you Mr. Maxey was a

9    part of that initial group that stopped in front of the bank

10   before trying to damage anything in connection with the

11   bank?

12   A.  Yes.

13   Q.  Did the agent tell you that Mr. Maxey specifically was

14   involved in damaging the ATM machine of the bank?

15   A.  What he had told me was the group -- the same group was

16   responsible for the ATM as they were for the window.  He

17   never specifically stated to me that the one in the tan

18   cargo pants and black jacket participated in the breaking of

19   the ATM.  He just specifically said that this was the same

20   group that broke the ATM as the one that broke into the

21   bank.

22   Q.  So then to be clear, then, you have no information,

23   whether from that agent or from any other source, that

24   Mr. Maxey was personally involved in [indiscernible] the ATM

25   of the SunTrust Bank.  Is that correct?

1    A.  Based -- unless that agent were to provide a more

2    detailed explanation from what he had told me, then no.

3    Q.  Moving on to -- as I understand it, the next events are

4    that the windows of the bank were broken.  Is that correct?

5    A.  Yes.  One front window was broken.

6    Q.  And do you know what object was used to break the

7    window?

8    A.  It appeared there was multiple objects that were used to

9    break the window.

10   Q.  Can you describe those objects?

11   A.  A couple of the objects were small enough.  You know,

12   you can't really tell the size.  In one still there's a

13   bucket that was being used and in another still you see

14   where an individual appears to be using a pole to finish

15   breaking it.

16   Q.  I'm sorry.  Did I hear you say a phone, a telephone?

17   A.  No; a pole.

18   Q.  Oh, a pole.

19        Let me ask, with regard to the ATM machine, what

20   object was used to break the ATM machine?

21   A.  I don't have that information.  I don't know.

22   Q.  Okay.  Now, with regard to the window of the SunTrust

23   Bank, did the agent indicate that Mr. Maxey was personally

24   involved in breaking the window?

25   A.  Again, the agent only specified that it was the group.

1    The agent didn't specifically say that Mr. Maxey -- you

2    know, like specifically say it was just him that broke the

3    window.

4    Q.  And you have been -- other than the agent, there's no

5    other source that you have that would indicate that

6    Mr. Maxey had any involvement personally in breaking the

7    window?

8    A.  In the surveillance video, you see that same individual

9    in cargo pants, black boots and a black jacket holding a

10   bucket.  I would have to review the video again to see if

11   that bucket was [indiscernible] the bucket.

12   Q.  So that would be your only source.  And it sounds like

13   at the moment you cannot say that Mr. Maxey was personally

14   involved in breaking the window.  Is that correct?

15   A.  Correct.

16   Q.  Now, did the agent tell you that he or she specifically

17   saw Mr. Maxey enter that bank?

18   A.  Yes.  That is correct.

19   Q.  All right.  Did the agent tell you -- well, as I

20   understand your testimony, there were two moments, if you

21   will, where these individuals are in the bank.  I think you

22   described an initial period that was short and then a second

23   time period that was longer.  Is that fair to say?

24   A.  Yes.

25   Q.  Is it your understanding Mr. Maxey entered the bank both

```
 1    times?

 2    A.  Yes.

 3    Q.  And did you understand that from the agent?

 4    A.  The agent and the surveillance video.

 5    Q.  Okay.  So both sources indicate to you that Mr. Maxey

 6    entered the bank on each occasion?

 7    A.  That is correct.

 8    Q.  But between the two periods, when they came back outside

 9    the bank and before going in the second time, do you know --

10    can you testify about what they were doing?

11    A.  In that short time period of leaving the bank?  It

12    appears from the surveillance video that Mr. Maxey holds

13    hands with the female.  They walk towards K Street in front

14    of the bank and then you lose sight of them at the -- from

15    the inside surveillance video.

16              The agent never specifies -- or never said that

17    they lost sight of the group.  They said that the group came

18    back and entered the bank.

19    Q.  Let me ask this:  Did all six to ten people exit the

20    bank and then reenter or just a few?

21    A.  It appears -- I'd have to go back and take a look.  But

22    it appears most of them that left came back.

23    Q.  Okay.  Now, this second time, did the agent estimate for

24    how long Mr. Maxey was allegedly inside the bank?

25    A.  You said the second time?
```

1    Q.  Correct.

2    A.  I'd have to go back and take a look the timestamps.

3    Maybe a couple [indiscernible], tops.

4    Q.  I was going to ask two separate questions.  One would be

5    what you learned from the agent.  The second question is

6    what you learned from the video.

7            It sounds like the answer was -- well, it sounds

8    like your -- you were trying to answer about the video.  Is

9    that -- what did the agent tell you about how long Mr. Maxey

10   was in the bank during that second time?

11   A.  He didn't give a time for how long they were in the

12   bank.

13   Q.  Okay.

14   A.  He just talked about the group being in the bank coming

15   out, going back in the bank and coming out.

16   Q.  And it sounds like you said with regard to what you

17   learned from the video, you don't recall what the timestamp

18   shows.  Is that fair to say?

19   A.  Yes.

20   Q.  Do you know whether it was more or less than five

21   minutes?

22   A.  That I couldn't tell you.

23           MR. MOHANTY:  Objection.  Calls for speculation.

24           MR. MILES:  Well, I'm only asking if he knows,

25   your Honor.

```
 1              THE COURT:  Overruled.

 2              But the witness said that he doesn't know.

 3    BY MR. MILES:

 4    Q.  And again, only if you know:  What about ten minutes?

 5    More or less than ten minutes?

 6    A.  I couldn't tell you.

 7    Q.  So you're saying it's possible that they were in for

 8    more than ten minutes?  You don't know.  I understand you

 9    don't know.

10    A.  I don't know how else to answer the question.

11              MR. MOHANTY:  Objection.  Asked and answered, your

12    Honor.

13              THE COURT:  Could you move on, Mr. Miles.

14              MR. MILES:  I mean, we have no estimate about how

15    long.  And I think the witness should give us some sense of

16    the timing they allege that Mr. Maxey --

17              MR. MOHANTY:  Objection.  Your Honor, with all due

18    respect, he asked the witness if he knew.  The witness said

19    no.  It's time to move on.

20    BY MR. MILES:

21    Q.  So is it fair to say that he may have been in the bank

22    for less than two minutes?

23    A.  Again, I couldn't give you a timestamp on how long they

24    were in the bank for.

25              THE COURT:  So at this point, let me interject.
```

```
1              Agent Moore, you don't -- is it your testimony
2    that you don't know how long Mr. Maxey was in the bank?
3              THE WITNESS:  That is correct, your Honor.  I
4    don't feel comfortable giving a specific time, not knowing
5    the timestamp.  I watched the surveillance video.  I
6    [indiscernible] timestamp [indiscernible].
7              THE COURT REPORTER:  I'm sorry.  Your voice is
8    distorted, sir.
9              THE WITNESS:  I watched the surveillance video.  I
10   don't feel comfortable with giving a timestamp on it.  I was
11   looking at the individuals going into the bank and coming
12   out, a clothing description, things like that.  And the
13   agents never gave a time of how long they were in the bank
14   or, you know, out of the bank and then back in the bank.
15             THE COURTROOM DEPUTY:  Excuse me.  This --
16             THE WITNESS:  The time would be on the
17   surveillance video.  I just -- you know, I don't have the
18   time.
19             THE COURTROOM DEPUTY:  Excuse me.  This is
20   Kimberly Kay, the court reporter deputy.
21             Agent Moore, are you in an area that has a door
22   that's open?  We're hearing --
23             THE WITNESS:  Yes.
24             THE COURTROOM DEPUTY:  Can you close that door or
25   are you not able to close that door?
```

```
 1                THE WITNESS:  I should be able to close it.

 2                THE COURTROOM DEPUTY:  Thank you.  I don't know if

 3      it makes that much difference, but thank you anyhow.

 4                THE AUDIOVISUAL TECHNICIAN:  Tony Miles, can you

 5      mute your microphone for just five seconds?

 6                MR. MILES:  Yes.

 7                THE AUDIOVISUAL TECHNICIAN:  I don't know if the

 8      noise is coming from your connection.  But it went away

 9      momentarily.

10                MR. MILES:  All I can think of -- well, let me say

11      this:  I've been using this laptop for a lot of hearings, so

12      I suspect it's not that.  It may be the air conditioning.  I

13      do hear air conditioning going on.  That's the only noise I

14      can hear in my place.

15                THE AUDIOVISUAL TECHNICIAN:  Is it possible for --

16      do you have a telephone available?

17                MR. MILES:  Yes.

18                THE COURT:  Could you mute the microphone on the

19      video and then connect to the AT&T call and make your

20      remarks that way?  At least then we'll know if that noise is

21      coming from your end or not.

22                MR. MILES:  Okay.  So what I'll do, I'm going to

23      mute the microphone on the video and then I'll call in on

24      the phone line.

25                THE AUDIOVISUAL TECHNICIAN:  Yes.
```

```
1                MR. MILES:  I don't have it handy right now.  Can
2       someone give it to me?
3                THE COURTROOM DEPUTY:  It's -- are you ready,
4       Mr. Miles?
5                MR. MILES:  I am.
6                THE COURTROOM DEPUTY:  ████████████.  The access
7       code is ██████████.
8                MR. MILES:  Okay.
9                THE COURT:  Mr. Miles, might you be able to drop
10      off and come back on?  Sometimes I just have found I get a
11      bad connection.
12               MR. MILES:  I'll do that.  I'll sign off and come
13      back on.
14               THE COURT:  Thank you.
15               THE DEFENDANT:  Can I do the same?
16               MR. MILES:  What was that?
17               THE DEFENDANT:  Can I do the same?
18               MR. MILES:  I think if you stay mute, there's no
19      problem.
20               THE DEFENDANT:  Okay.
21               MR. MILES:  Unless he needs to speak with me, your
22      Honor.  If he wants to talk to me about the case.
23               THE COURT:  Mr. Maxey, did you want to try to see
24      if you get video if you logged back on or did you want to
25      talk to Mr. Miles?
```

```
 1                  THE DEFENDANT:  Yeah.  I was talking to Mr. Miles.
 2                  MR. MILES:  Your Honor, thank you for reminding
 3       me.  I forgot that Mr. Maxey lost video.
 4                  THE COURT:  I just remembered because his image is
 5       completely still.
 6                  MR. MILES:  Well, let me -- I'll be very quick
 7       with Mr. Maxey.  I don't want to delay the proceedings.  And
 8       then I'll sign off and come back on.
 9                  THE COURT:  Thank you.
10                  (Brief pause in the proceedings.)
11                  THE COURT:  For those still on the line, I'm going
12       to turn my camera off, but I am still here.
13                  THE COURTROOM DEPUTY:  Hello, everyone.  This is
14       Kimberly Kay, courtroom deputy.  So I was dropped from the
15       video.  I see Agent Moore; I see Lisa Edwards.
16                  Mr. Mohanty, are you still connected?
17                  MR. MOHANTY:  Yes, I am.
18                  THE COURTROOM DEPUTY:  And Christine?
19                  THE PRETRIAL SERVICES OFFICER:  Yes, I am.
20                  THE COURTROOM DEPUTY:  Mr. Maxey and Mr. Miles,
21       mute your microphones, please.
22                  THE COURT:  I've lost track of who we had on this
23       video.  Where is Mr. Miles?  Wait a minute.  Wait.  Hold on.
24                  Now I see Mr. Miles, Lisa, Agent Moore and
25       Mr. Maxey.
```

```
 1                 Can you all see each other now?
 2                 MR. MILES:  Yes.
 3                 THE COURT:  I'm going to mute my microphone now.
 4      Thank you.
 5                 MR. MILES:  I've muted my microphone.  Is that
 6      better?
 7                 THE COURT REPORTER:  It's much better.
 8                 THE AUDIOVISUAL TECHNICIAN:  It is.
 9                 THE COURT:  This is Judge Meriweather.  Sometimes
10      when I turn my video on and off, I don't come back.  Can you
11      see me?
12                 MR. MILES:  No.  I don't.
13                 THE COURT:  Let me try turning it on and off
14      again.
15                 MR. MILES:  Now I see you.
16                 THE COURT:  Great.  Thanks.
17                 I think Mr. Miles was asking questions.  Are we
18      nearing the end, Mr. Miles?
19                 MR. MILES:  Yes.  I believe so, your Honor.
20      BY MR. MILES:
21      Q.  I think if I recall correctly, we were dealing with the
22      two different time periods when you said people were inside
23      or outside the bank and you were testifying about what you
24      saw kind of in between moments.  I think you may have
25      completed your testimony with regard to that question.  Is
```

1    that correct?  If so, I'll go on to --

2    A.  Yes.

3    Q.  -- the next question.  Okay.

4         Then of course we were dealing with -- this is

5    where we left off, actually -- how much time Mr. Maxey was

6    in the bank.  And you were unable to estimate that time and

7    you do not recall the time the timestamps show on the video?

8    A.  That is correct.

9    Q.  And even two minutes?  You were not able to tell me that

10   he was in the bank for more or less than two minutes?

11   A.  I didn't want to -- yes.  I just didn't want to give a

12   time that may not match with the surveillance video.  But

13   the surveillance video does show the timestamps.

14   Q.  So based on -- I'm going to speed this up.  With regard

15   to the questions, I think what I've been doing is from the

16   agent and from the video.  I'm going to try to kind of

17   combine it.  If I think it's necessary, I might ask a

18   specific question about whether that is from the agent or

19   from the video.

20        Based on your agent -- on talking to the agent,

21   watching the video, these questions are going to bear on

22   that.

23        So my question is:  Did you observe or have any

24   information that Mr. Maxey took anything from the SunTrust

25   ATM machine?

1     A.  I do not have any information that he took anything from

2     the ATM.

3     Q.  Okay.  If I understand, no other entryway to the bank,

4     like the door was not broken or any other entryway.  Is that

5     correct?

6     A.  That is correct.

7     Q.  And from what you could tell, it appears they entered

8     the bank through the broken windows.  Is that correct?

9     A.  That is correct.

10    Q.  Okay.  Now, based on your investigation, do you have any

11    evidence that Mr. Maxey broke anything that belonged to the

12    SunTrust Bank?

13    A.  I don't have anything that is directly tied to Mr. Maxey

14    that he broke anything.

15    Q.  Through your investigation, do you have any information

16    that Mr. Maxey actually gained currency belonging to the

17    SunTrust Bank or from inside the SunTrust Bank?

18    A.  No.

19    Q.  And what about the woman he was with?  Any evidence that

20    she took any currency from inside the bank or belonging to

21    the bank?

22    A.  No.

23    Q.  Based on your investigation, do you have any evidence

24    that Mr. Maxey took anything belonging to the bank or from

25    inside the bank?

1    A.  No.  I don't have any information.

2    Q.  And the same question with regards to the female that

3    you said he was with.

4    A.  Yeah.  No.

5    Q.  Is there any evidence that any of the people that

6    entered the bank took anything that you believe belonged to

7    the bank or from inside the bank?

8    A.  No.  We don't have any information that anything was

9    taken from the bank.

10   Q.  And I assume through the investigation there were

11   conversations with agents of the SunTrust Bank.  Is that

12   correct?

13   A.  You mean like people that are employed by SunTrust?

14   Q.  Correct.

15   A.  I believe so.  I think those are in the police report.

16   Q.  Did they indicate that any of their property was missing

17   as a result of the --

18   A.  Nothing that I saw.  No.

19   Q.  And nothing that they told you.  Is that correct?

20   A.  I never specifically spoke with them.  But in a police

21   report, I didn't see anything that the bank was missing

22   anything.

23   Q.  And you talked to this other officer about Mr. Maxey

24   being arrested.  Was he -- did the officer describe him as

25   being cooperative after he was arrested?

```
1    A.  The officer didn't mention --

2              MR. MOHANTY:  Objection.  Relevance.

3              MR. MILES:  Well, your Honor, it goes to the

4    consciousness of guilty, trying to understand how he was

5    behaving, how he was acting.

6              THE COURT:  Okay, Mr. Miles.  It's overruled for

7    this question.  But please don't go further into it, because

8    I'm not seeing the connection to probable cause.

9              You can answer the question.

10             THE WITNESS:  The officer did not mention anything

11   about how cooperative he was.

12   BY MR. MILES:

13   Q.  Did they indicate whether Mr. Maxey was searched?

14   A.  The officer did not talk about a search.  All I saw was

15   that he was searched at the First District precinct.

16   Q.  So I guess the more important question is:  At any time

17   to your knowledge was any currency belonging to the SunTrust

18   Bank recovered from Mr. Maxey?

19   A.  No.

20   Q.  Was any property belonging to the SunTrust Bank

21   recovered from Mr. Maxey?

22   A.  No.

23   Q.  Any tools or items that could be used or that you

24   believe were used in breaking the windows or breaking the

25   ATM machines recovered from Mr. Maxey?
```

1    A.  No.

2    Q.  Was there anything recovered from Mr. Maxey that's

3    relevant to the case?

4    A.  No.

5    Q.  Do you know whether Mr. Maxey made any statement about

6    whether he was or was not involved in this alleged offense?

7    A.  I do not know --

8              MR. MOHANTY:  Objection, your Honor.

9              THE COURT:  Overruled.

10             MR. MILES:  If he made a statement, that's clearly

11   relevant to probable cause.

12   BY MR. MILES:

13   Q.  What's the answer, Officer?

14   A.  I don't know of any statement that he made.  No.

15   Q.  Okay.  You indicated that the officer that was across

16   the street in his car identified Mr. Maxey as I understand

17   it after he was apprehended.  Is that correct?

18   A.  Yes.  He had already been stopped by police when the

19   identification was made.

20   Q.  Did the officer make that identification still seated in

21   his or her vehicle across the street?

22   A.  Unfortunately, I didn't ask the question how far --

23   well, it was across the street from the arrest, but I didn't

24   ask how far of a distance that was, if he had moved from the

25   original position or not.

1    Q.  Do you know anything about the identification procedure

2    that was used for the -- any officer to identify Mr. Maxey?

3    A.  No.

4    Q.  As I understand it from your testimony, I believe the

5    female with Mr. Maxey was also arrested?

6    A.  That is correct.

7    Q.  And was she arrested based on --

8         MR. MOHANTY:  Objection.  Objection to relevance,

9    your Honor.

10        MR. MILES:  Your Honor, if they suspect anybody

11   else committed the same crime they're charging Mr. Maxey

12   with, that certainly --

13        THE COURT:  Sustained.  I don't think that goes to

14   probable cause for Mr. Maxey's charges.

15   BY MR. MILES:

16   Q.  The other -- so I'm deducing that the other individuals

17   that allegedly were inside the bank were never arrested.  Is

18   that correct?

19        MR. MOHANTY:  Objection.

20        THE WITNESS:  That is correct.

21   BY MR. MILES:

22   Q.  Is it because they got away or because --

23        MR. MOHANTY:  Objection.

24   BY MR. MILES:

25   Q.  -- they chose not to arrest them?

```
 1                 MR. MOHANTY:  Objection.

 2                 THE COURT:  Sustained.

 3                 Mr. Miles, you're getting too far away from

 4       probable cause for the charges against Mr. Maxey.

 5       BY MR. MILES:

 6       Q.  Officer, I asked you about whether any items were taken

 7       from the bank.  To be clear, through your investigation,

 8       other than -- well, let me -- other than the allegation that

 9       there was -- well, let me rephrase that.

10                 Through your investigation, do you have any

11       evidence that a felony was committed inside the bank --

12                 MR. MOHANTY:  Objection.  Calls for a legal

13       conclusion.

14       BY MR. MILES:

15       Q.  -- by Mr. Maxey?  By Mr. Maxey?

16                 MR. MOHANTY:  Calls for a legal conclusion, your

17       Honor.  Objection.

18                 THE COURT:  Mr. Miles, could you please repeat

19       your question?

20                 MR. MILES:  The question is:  Based on his

21       investigation, does he have any information that Mr. Maxey

22       committed a felony inside the bank, which is one of the --

23       which is an element?

24                 THE COURT:  If you rephrase that to ask whether he

25       has any evidence that he committed any crime in the bank, I
```

 1    will allow it.

 2              MR. MILES:  I'll rephrase.

 3    BY MR. MILES:

 4    Q.  Officer, do you have any evidence that Mr. Maxey

 5    committed any crime inside of the SunTrust Bank?

 6    A.  I mean, breaking into the bank.  We don't have any

 7    information that anything was stolen from the bank, but

 8    breaking into the bank, I believe, falls there.

 9    Q.  Thank you.

10              You testified on direct that this bank was FDIC

11    insured.  What do you base that on?

12    A.  It's a federally insured bank.  There's a list that sits

13    out there for, you know, people to see which banks are

14    federally insured.

15    Q.  I guess the question is:  Did you verify whether this

16    specific bank is federally insured?

17    A.  The bank does have markings.  SunTrust is a federally

18    insured bank.  I don't know how else to answer that

19    question.

20    Q.  I guess you testified that the bank is federally

21    insured.  I'm just trying to understand what you're basing

22    that testimony on, what investigation you did to come to

23    that conclusion.

24    A.  Just that there's signs on the bank that says it's

25    federally insured and SunTrust is a federally insured bank.

```
 1    You know, I don't know -- I didn't --

 2    Q.  When you say SunTrust is a federally insured bank, how

 3    do you know that?

 4    A.  It's on the list of federally insured banks.

 5    Q.  And did you look at that list after -- in connection

 6    with Mr. Maxey's arrest?

 7    A.  I did not look at the list after the arrest.  No.

 8    Q.  When was the last time you looked at that list and

 9    identified SunTrust as being on the list?

10    A.  I can't give you a time.

11          MR. MILES:  I have no further questions, your

12    Honor.

13          THE COURT:  Thank you.

14          Mr. Mohanty?  I think I muted my microphone.  Do

15    you have any redirect?

16          MR. MOHANTY:  Just very briefly, your Honor.  Yes.

17                    REDIRECT EXAMINATION

18    BY MR. MOHANTY:

19    Q.  Agent Moore, Mr. Miles, the defense lawyer, was asking

20    you some questions about how Mr. Maxey was identified from

21    those questions.

22    A.  Yes.

23    Q.  And one of the ways that you said you've identified him,

24    as I recall, was through his date of birth?

25    A.  Yes.
```

1    Q.  His FBI number?

2    A.  Yes.

3    Q.  The birth certificate that he had on him when he was

4    stopped that night?

5    A.  It listed his birth certificate as part of his evidence.

6    I never physically saw his birth certificate.

7    Q.  His address that he provided?

8    A.  Yes.

9    Q.  And his Social Security number?

10   A.  Yes.

11   Q.  And the identification cards that he had with him?

12   A.  Yes.

13   Q.  Did he generally match the physical description of the

14   person that is a black male?  I think you said you couldn't

15   estimate height; but a general build, I think you gave.  Is

16   that right?

17   A.  Yes.  Yes.

18   Q.  Mr. Miles asked you some questions about people going

19   into the bank, leaving, and then going back in.

20          Do you recall those questions?

21   A.  Yes.

22   Q.  Were you able to tell from any surveillance footage why

23   they went out and then went back in?

24   A.  It appeared that the -- there was a female that was

25   outside the bank.  It appears she may have said something to

1    them inside the bank.  But you can also see at the top of

2    the screen police emergency lights at the top of the screen.

3    Q.  Okay.  Thank you.

4         Mr. Miles was asking you about evidence recovered

5    from the Defendant.  Do you recall those questions?

6    A.  Yes.

7    Q.  And would it be correct that you saw the evidence that

8    was recovered and you could identify the Defendant in this

9    case with that clothing that you mentioned, the tan cargo

10   pants, black jacket, the black boots and that distinctive

11   sweater or sweatshirt that we've talked about?

12   A.  Yes.

13        MR. MOHANTY:  Thank you.  No further questions.

14        MR. MILES:  Your Honor, may I ask a quick line of

15   questions?

16        THE COURT:  Yes.

17                    RECROSS-EXAMINATION

18   BY MR. MILES:

19   Q.  Officer, I think it's important we have some context of

20   what was going on.  There were protests going on that

21   morning.  Is that correct?

22   A.  Yeah.  I believe so.  I wasn't in the city at that

23   moment.

24   Q.  Do you have any information about whether any other

25   businesses in that vicinity had their windows broken by

1    protesters?

2    A.  That information I don't have.

3          MR. MILES:  Nothing further, your Honor.

4          THE COURT:  Thank you.

5          Mr. Mohanty, could you briefly provide argument on

6    how the testimony that we've had from Agent Moore matches up

7    with the elements of the offense, specifically the aspect

8    that indicates that the entry was with the intent to commit

9    a felony while in the bank and the intent to commit larceny.

10         MR. MOHANTY:  Yes, your Honor.  Very briefly.

11         As -- first of all, as the Court knows, in this

12    hearing, we only have to show probable cause as to time, as

13    to the identity of the Defendant.

14         The testimony was clear that the agent that

15    observed these events described Mr. Maxey not by name, of

16    course, but by clothing description as one of the people

17    involved in the destruction of the ATM that was outside of

18    the bank but [indiscernible] the SunTrust ATM as shown in

19    Exhibit 1.

20         He further described that Mr. Maxey was, he

21    believed, one of the people involved in actually breaking

22    the window of that bank and then clearly going into the bank

23    at that time of day, 2:00 a.m.  After having broken the ATM,

24    which would contain nothing but money, the Defendant entered

25    the bank with the intent to commit either a felony or to

1    commit larceny, which does not -- which is all we need to

2    prove as far as the elements.

3            And as the officer described, the video shows and

4    some of those still photos that were shown in, I believe,

5    Government's Exhibits 6, 7, and 8 shows the Defendant going

6    behind the counter and as the agent described rummaging

7    through or ransacking the property of the bank, obviously

8    looking for something of value.  He's not going in there to

9    speak with anybody.  He's not going in there to make a

10   deposit.  Clearly, he's in there at 2:00 a.m. looking for

11   money or something of value to steal.  And we don't need to

12   show a dollar amount in this case; we just need to show that

13   he had the intent to commit larceny.

14           So therefore, we think we've met the elements,

15   your Honor.

16           THE COURT:  Thank you.

17           Response?

18           MR. MILES:  Your Honor, probable cause is still a

19   significant standard.  It's not beyond a reasonable doubt,

20   but it's still a significant standard.  And the Government

21   has not met their burden here today.

22           I'll start off with one of the elements:  They

23   have to prove that the bank is federally insured by the

24   FDIC.  I would say that, based on this testimony, they have

25   not done that.  There's no evidence that a real

1   investigation was done to verify whether or not this bank is

2   insured.

3          But there are other reasons they failed to meet

4   probable cause.  There are questions about whether Mr. Maxey

5   is a person inside the bank.  I mean, the description is

6   based, number one, on one eyewitness who was seated in a

7   vehicle from across the street.  We don't know anything

8   about whether the windows were up or down.  It was

9   nighttime.  We don't really know a lot about the lighting

10  conditions except kind of a vague, self-serving statement

11  that the lighting conditions were good.  But when it comes

12  down to where the lights were, how many lights, we have no

13  information about that.

14         The description is based on clothing and build

15  alone and race.  There was no description of facial

16  features, the eye color, [indiscernible] or mouth, no

17  information about height or weight.

18         And as I understand the testimony, what happens is

19  that they come and they arrest someone -- two people in that

20  area who they think match this -- what I'd say vague

21  description.

22         And finally, to the question the Court asked, the

23  Government has not shown probable cause that there was --

24  that Mr. Maxey had any intent to commit any felony or

25  specifically larceny inside the bank.

1          There is no evidence really, actually, that he was

2    involved in breaking any machines, no evidence that he --

3    the ATM machine that he was speaking of specifically, no

4    evidence that he broke the glass window, that he broke

5    anything with regards to the bank or even inside the bank,

6    that he broke into the bank.  There's no indication that he

7    was looking for currency.  He could have been looking for

8    somebody's -- some information.  He could have been just

9    trying to, you know, cause damage inside the building, you

10   know.  We know what was going on around that time.  And just

11   causing damage is something that I think some people have an

12   interest in doing.

13          I think it's significant that nothing was stolen

14   from the bank, that nothing was missing from the bank.

15   There was no evidence of any currency or any item belonging

16   to the bank that was recovered from Mr. Maxey.

17          Mr. Maxey made no statement indicating what his

18   intent was, you know, if we agree with the Government that

19   he was even in the bank or any statement at all in

20   connection that would incriminate him in connection with

21   these allegations.

22          And so I think for a variety of reasons the

23   Government has failed to meet its burden with respect to

24   probable cause and the complaint should be dismissed.

25          THE COURT:  Agent Moore, I have a question for

1    you, because I'm looking at my notes.  So my notes indicate

2    that you said that there was no -- that you didn't see or

3    weren't told anything indicating that Mr. Maxey himself had

4    rummaged through the ATM.  Is that -- I don't want to put

5    words in your mouth, because my notes may be wrong.  But

6    just tell me what evidence you have that connects Mr. Maxey

7    to the ATM.

8              THE WITNESS:  Yes, your Honor.

9              In regards to the ATM, all I have is the agent had

10    stated to me that that group that came down the street was

11    the same group that destroyed the ATM.  I don't have any

12    other specifics in regards to, you know, who exactly -- how

13    that group destroyed it, if the whole group destroyed it or

14    what instrument was used to destroy it.

15             THE COURT:  Thank you.

16             And then could you just clarify for the record,

17    Agent Moore, what was Mr. Maxey seen doing inside the bank,

18    if anything?

19             THE WITNESS:  Yes.  He was the first one to come

20    into the bank when the window was broken.  And when he was

21    in there the second time, which appeared to be a longer time

22    than the first time, it is seen that he is -- it appears

23    that he's going through drawers behind the teller line and,

24    you know, looking for stuff on the countertop.

25             THE COURT:  Thank you.

1          THE WITNESS:  Yes, your Honor.

2          THE COURT:  After hearing the testimony provided

3    by Special Agent Moore and reviewing the exhibits that the

4    Government submitted, I conclude that the Government has

5    demonstrated probable cause to support the charged offense.

6          Specifically, Agent Moore's testimony about the

7    markings on the bank indicating that SunTrust Bank is FDIC

8    insured as well as his general knowledge of SunTrust being

9    on a list of FDIC-insured banks, recognizing that he could

10   not state when he consulted that list, is enough to indicate

11   that it is -- to provide probable cause that it is an

12   FDIC-insured bank.

13         The element of the entry or attempt to enter:

14   Probable cause is satisfied by Agent Moore's testimony that

15   it's corroborated by photographs that Mr. Maxey entered the

16   bank with a group of individuals.

17         The aspect where it is a closer question is

18   whether the entry was with the intent to commit any felony

19   or larceny, given that there does not appear to be any

20   indication that Mr. Maxey was attempting to break into or

21   otherwise access an ATM.

22         However, Agent Moore's testimony that Mr. Maxey

23   was going through teller drawers and the counters is enough

24   to meet the probable cause standard for that element of the

25   offense.

1           And in addition, in terms of probable cause of

2     identifying Mr. Maxey, there's sufficient information

3     regarding the identification of Mr. Maxey at the scene of

4     his arrest, notwithstanding the inability to identify

5     Mr. Maxey through the video connection today, which has

6     shadows.

7           So that is enough to provide probable cause that

8     Mr. Maxey is the right person with respect to the charges.

9           As a result, I will not dismiss this case.  I

10    should note that the probable cause finding is very

11    different and a much lower standard than the standard that

12    would apply at trial.  So this is in no way a finding that

13    there is -- that has any bearing, quite frankly, on whether

14    Mr. Maxey is guilty or innocent.  He has -- retains the

15    presumption of innocence unless he is proved guilty by a

16    reasonable doubt.

17          If this case goes to trial, the jury will not hear

18    anything about this probable cause finding.  It will be a

19    clean slate with an opportunity to put the Government to its

20    burden of proving that the charged offense actually occurred

21    and that Mr. Maxey committed that offense.

22          So the Government has satisfied its burden first

23    to get past this stage of the proceedings.

24          Should we set a -- at this point, we don't know

25    when exactly the grand jury will reconvene and whether there

1    would be an indictment, whether anything else would be

2    filed.  So I think we should set a status hearing date just

3    so that this case stays on the Court's radar.  Is there a

4    time frame in which the Government or defense would like to

5    have that status?

6              MR. MOHANTY:  Your Honor, this is Mr. Mohanty.

7              I would ask for something no sooner than 30 to 45

8    days.  I don't think our grand jury is going to convene for

9    some time.

10             MR. MILES:  Your Honor, I was actually thinking 60

11   days.

12             MR. MOHANTY:  That's fine for the Government, your

13   Honor.

14             THE COURT:  So that would be around August -- let

15   me check a calendar and make sure I'm not picking the wrong

16   date.  Just a minute.

17             August 10th is a Monday.  Would that work for a

18   status hearing date for the parties and for Mr. Maxey?

19             MR. MILES:  It works for me.

20             Mr. Maxey, does it work for you?

21             THE DEFENDANT:  When was that again?

22             MR. MILES:  Monday, August 10th.

23             THE DEFENDANT:  Is there any way we could push it

24   a little further a few days?

25             MR. MILES:  Sure.  By "a few days," you mean a

```
1    week or two?

2              THE DEFENDANT:  No.  Like three days.  Three days

3    or so.

4              MR. MILES:  Sure.

5              THE DEFENDANT:  Yeah.

6              THE COURT:  Thank you.  Mr. Maxey, can you mute

7    again?

8              THE DEFENDANT:  Oh, okay.

9              THE COURT:  Thank you.

10             August 13th or 14th I think should work.  I don't

11   have Judge Harvey's calendar in front of me.

12             MR. MOHANTY:  That works for the Government, your

13   Honor.

14             MR. MILES:  It works for me.

15             Mr. Maxey, August 13th is a Thursday of that same

16   week and August 14th is a Friday of that week.  Does that

17   work for you?

18             THE DEFENDANT:  Yes.  August 13th sounds good.

19             MR. MILES:  The 13th?  Okay.

20             THE COURT:  Ms. Kay, would 2:00 p.m. be a good

21   time for Judge Harvey's calendar?  It would be by telephone.

22             THE COURTROOM DEPUTY:  I don't know.  By that

23   time, he may want to actually -- the Defendants may be

24   coming into the courthouse by that time.

25             THE COURT:  Why don't we set it by telephone and
```

1    I'll give Judge Harvey a heads-up that if he wants it to be

2    in person, he can reach out.  Because it sounds like if I'm

3    recalling correctly Mr. Maxey lives in New York, but is

4    trying to locate to DC.  So travel will be an issue.

5            THE COURTROOM DEPUTY:  That's right.  I forgot

6    about that.  That sounds good, your Honor.

7            THE COURT:  Okay.  So 2:00 p.m., August 13th, will

8    be the next status hearing date.  We will set it as a

9    telephonic hearing.  If it converts to in-person, Judge

10   Harvey's courtroom deputy will reach out to let counsel and

11   the Defendant know.

12           MR. MILES:  Thank you, your Honor.

13           MR. MOHANTY:  Thank you, your Honor.

14           THE COURT:  Thank you.

15           Are there any other issues before we adjourn?

16           MR. MILES:  Not from the defense.

17           MR. MOHANTY:  Not from the Government, your Honor.

18           THE COURT:  Okay.  Great.  Thank you.

19           MR. MILES:  Thank you.

20           MR. MOHANTY:  Thank you.

21           THE DEFENDANT:  Thank you.

22           (Proceedings concluded.)

23

24

25

1                          **<u>CERTIFICATE</u>**

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8                    Please note:  This hearing occurred

9    during the COVID-19 pandemic and is therefore subject to the

10   technological limitations of reporting remotely.

11

12

13                    Dated this 27th day of July, 2020.

14

15           <u>/s/ Lisa Edwards, RDR, CRR</u>
             Official Court Reporter
16           United States District Court for the
               District of Columbia
17           333 Constitution Avenue, NW, Room 6706
             Washington, DC 20001
18           (202) 354-3269

19

20

21

22

23

24

25